UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| CLARIAN HEALTH PARTNERS, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 1:05-cv-0726-JDT-WTL |
| MICHAEL LEAVITT, Secretary, Department of Health and Human Services, | ) ) ) ) ) | |
| Defendant. | ) ) | |

**Entry on Plaintiffs' Motion for Summary Judgment (Document No. 23) and Defendant's Motion for Summary Judgment (Document No. 26)**

Plaintiffs seek an award of payments allegedly owed by the federal government for the provision of inpatient services to Medicare Program patients whose care was substantially more expensive than average patients with similar diagnoses.  Both sides seek summary judgment.  After hearing oral argument, the court decides as follows.

**I.      Background**

Under Medicare, a federal health insurance program for the elderly and disabled, qualifying hospitals can be reimbursed for providing services to eligible patients.  *See* 42 U.S.C. § 1395 *et seq.*  Reimbursement under Medicare is governed by a "complex statutory and regulatory regime." *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993).  From sometime in 1965 until October 1983, hospitals were compensated for the "reasonable costs" of the inpatient services they provided.  *See* 42 U.S.C. §

1395f(b). In 1983, to provide incentives for hospitals to keep costs down, Congress passed the Social Security Amendments Act of 1983, Pub. L. No. 98-21, 97 Stat. 65 (1983) (codified as amended at 42 U.S.C. § 1395ww(d)), which implemented the "Prospective Payment System" ("PPS"). Under the PPS, qualifying hospitals are reimbursed at prospectively set rates, regardless of the actual costs incurred by them in providing services.

The determination of the prospectively set rates is a complex process. The rates change each federal fiscal year. *See* 42 U.S.C. § 1395ww. Before the beginning of each new fiscal year, the Secretary conducts a rulemaking proceeding to determine rates prospectively for the coming year and publishes the rates. *See id.* § 1395ww(d). Very generally, the rates are determined from a statutory formula based on a standard nationwide cost rate which is based on, *inter alia*, the average costs of inpatient hospital services, *see id.* § 1395ww(d)(2), and the classification of a patient's illness by diagnosis-related group ("DRG"), *see id.* § 1395ww(d)(4)(A). The Secretary assigns a weighting factor for each DRG that reflects the hospital resources used to treat patients with illnesses under that DRG relative to the resources used for other illnesses. *See id.* § 1395ww(d)(4)(B). Thus, "[t]he more complicated and costlier the treatment is, the greater the weight assigned to that particular DRG will be." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1008 (9th Cir. 1999), *cert. denied*, 530 U.S. 1204 (2000). The national DRG prospective payment rate is then calculated by multiplying the standardized amount by the weighting factor as determined for the applicable DRG. *See* 42 U.S.C. § 1395ww(d)(2)(G), (3)(D).

In response to the PPS, hospitals argued that they would be under compensated for providing services to patients whose care was extraordinarily costly, whether because of an unusually lengthy hospital stay or unusually high costs. This prompted Congress to authorize the Secretary to make additional payments, known as "outlier payments," to hospitals. *See* 42 U.S.C. § 1395ww(d)(5)(A)(i)-(iv). Outlier payments were "intended to insulate hospitals from aberrational and extraordinary costs." *County of Los Angeles*, 192 F.3d at 1018. In 1991 through 1996, a hospital could receive a day-outlier payment or cost-outlier payment. 42 U.S.C. § 1395ww(d)(5)(A)(i)-(ii). Cost-outlier payments could be made in 1991-1994 whenever the hospital's cost-adjusted charges exceeded a fixed multiple of the applicable DRG prospective payment rate or a fixed dollar amount determined by the Secretary, whichever was greater. *Id.* § 1395ww(d)(5)(A)(ii). Beginning in fiscal year 1994, cost-outliers could be made whenever the cost-adjusted charges exceeded a sum based on, *inter alia*, the applicable DRG prospective payment rate. *Id.* § 1395ww(d)(5)(A)(ii). Congress provided that the amount of outlier payments "shall be determined by the Secretary and shall . . . approximate the marginal cost of care beyond the cutoff point applicable" to the day or cost outlier. *Id.* § 1395ww(d)(5)(A)(iii).

Clause (iv) of § 1395ww(d)(5)(A) is at issue in this case:

> The total amount of the additional payments made under this subparagraph for discharges in a fiscal year may not be less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year.

3

Since 1989, the Secretary has set the outlier thresholds at 5.1% of DRG prospective payments. *E.g.*, 60 Fed. Reg. 45778, 45855 (Sept. 1, 1995). For the years the Plaintiffs challenge here, 1991 through 1996, actual outlier payments fell short of 5% of DRG prospective payments, ranging from 3.5% to 4.24%. *See* 57 Fed. Reg. 39,746, 39,783-85 (Sept. 1, 1992); 58 Fed. Reg. 46,270, 46,347 (Sept. 1, 1993); 59 Fed. Reg. 45,330, 45,408 (Sept. 1, 1994); 60 Fed. Reg. 29,202, 29,260-61 (June 2, 1995); 61 Fed. Reg. 46,166, 46,229 (Aug. 30, 1996); 62 Fed. Reg. 45,966, 46,041 (Aug. 29, 1997).[1]

The Plaintiffs are qualified providers under the Medicare program. Medicare providers dissatisfied with a final determination of payment may seek administrative and judicial review. The Plaintiffs administratively appealed this matter and exhausted administrative remedies, making this case ripe for such review. The court has jurisdiction pursuant to 42 U.S.C. § 1395*oo*(f). Venue is proper in this district pursuant to 42 U.S.C. § 1395*oo*(f)(1).

## II. Discussion

The parties agree that there exist no material facts in dispute and that this case may be resolved as a matter of law on the cross-motions for summary judgment. The issue presented is whether the Secretary has complied with § 1395ww(d)(5)(A)(iv), which requires an interpretation of that provision. The Plaintiffs contend that because the actual outlier payments were less than 5% of the total projected DRG payments for

---

[1] The Secretary reports that in other years the actual amount of outlier payments has been more than 6% of the total DRG payments.

each of the years at issue, the Secretary did not comply. Under the Secretary's interpretation, "the thresholds for outliers are established prior to the year in which they will apply, and the Secretary is required to set the cutoff point thresholds at levels he estimates will result in outlier payments being between five and six per cent of total payments." (Mem. Supp. Def.'s Mot. Summ. J. at 8 (footnote omitted).)

The interpretation of a statute presents a question of law for which summary judgment is appropriate. The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002) (same standard applies on cross-motions for summary judgment as is applied on any other summary judgment motion).

An issue of statutory interpretation is governed by the standard set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under the *Chevron* standard, the first question is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If the court, "employing traditional tools of statutory construction," *id.*, at 843 n. 9, finds that Congress' intent as to the issue is clear, then that intent must be given effect, *id.* at 843 n.9. However, "if the statute is silent or ambiguous with respect to the specific issue," the court defers to the

agency's interpretation if it is based on a permissible construction of the statute," *id.* at 843, that is, if it is "reasonable," *id.* at 845. "The court need not conclude that the agency construction was the only one it permissibly could have adopted. . . ." *Id.* at 843 n.11. Because "Medicare is a highly complex and technical program . . . deference to the Secretary's determinations in the course of administering the system is especially warranted." *Paragon Health Network, Inc. v. Thompson*, 251 F.3d 1141, 1149 (7th Cir. 2001).

In interpreting a statutory provision, the court looks to the specific language at issue, the surrounding context, and the design of the statute. *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1014 (9th Cir. 1999), *cert. denied*, 530 U.S. 1204 (2000). The Plaintiffs argue that the statute and legislative history clearly establish that Congress intended that outlier payments constitute not less than 5% of total projected or estimated DRG payments. The Secretary contends that the statute is ambiguous and requires that the outlier rates be set prospectively like the other elements of the PPS.

    *A.    Statutory Text*

According to the Plaintiffs, the plain language of the statute unambiguously mandates that the Secretary make outlier payments in a range specified by the terms of the statute: "the total amount of additional payments made . . . may not be less than 5 percent." 42 U.S.C. § 1395ww(d)(5)(A)(iv). They assert that even the time period for which payments must be made is specified in the statute, and it is. But that is beside

the point since the Plaintiffs have not argued that outlier payments were not made for any particular fiscal year. Instead, they assert that the payments were insufficient.

The Plaintiffs find support for their position in their view that "[t]he verb 'made' in the phrase 'additional payments made' is past tense" (Br. Supp. Pls.' Mot. Summ. J. 14), which reveals Congress's intent that the payment made for the year be between five and six percent. However, "made" is not used as a past tense verb in this provision. Instead, it is part of the adjectival phrase "of the additional payments made," *see County of Los Angeles*, 192 F.3d at 1013; *see also* Kenneth G. Wilson, The Columbia Guide to Standard American English 13 (Columbia Univ. Press. 1993) ("an adjectival . . . modifier is a 'word, phrase, or clause that works like an adjective'"), which modifies the noun "amount." The adjectival phrase does not indicate the past tense and thus "allows alternative temporal readings." *County of Los Angeles*, 192 F.3d at 1013; *see also Rush-Presbyterian-St. Luke's Med. Ctr. v. Thompson*, 2003 WL 22019351 at *5 (N.D. Ill. Aug. 25, 2003) (stating that the phrase "payments made" "is silent on the matter of time").

The Plaintiffs find authority for their position in the district court's decision in *County of Los Angeles v. Shalala*, 992 F. Supp. 26, 31 (D.D.C. 1998), *rev'd*, 192 F.3d 1005 (D.C. Cir. 1999), *cert. denied*, 530 U.S. 1204 (2000), which held that § 1395ww(d)(5)(A)(iv) contained no ambiguity. The Plaintiffs acknowledge the D.C. Circuit's reversal, but maintain that the court found ambiguity on the question whether the outlier provision required retroactive adjustment of outlier payments. They attempt

7

to distinguish *County of Los Angeles* by claiming that their position in this case does not require retroactive adjustment of outlier payments. Their efforts are unavailing.[2]

The district judge in *County of Los Angeles* stated: "The precise question in this case is whether § 1395ww(d)(5)(A)(iv) requires the Secretary to make retroactive adjustments to outlier payments when the total outlier payments for a fiscal year turn out to be less than five percent (or more than six percent) of the total payments estimated to be made for that year." 992 F. Supp. at 30. And the court recognized that the first issue "is the proper interpretation of" § 1395ww(d)(5)(A)(iv). *Id.* It is only after first determining the proper interpretation of (d)(5)(A)(iv) that the court can then determine whether the statute requires retroactive adjustments to outlier payments that fall below the 5% mark.

In the court's view, the Plaintiffs' theory in this case necessarily leads to retrospective rate setting. That is, after all, the ultimate result they seek–a retroactive adjustment of outlier payments. (*See* Compl. Award Sums Due Under Medicare Act, ¶ 1 ("Plaintiff hospitals seek payments owed by the federal government for provision of inpatient hospital services to Medicare Program beneficiaries."); Prayer for Relief, ¶ 2 (requesting judgment "ordering the Secretary to . . . pay[] Plaintiffs additional outlier amounts representing the pro-rata differences between payments received for outliers

---

[2] The Plaintiffs assert that their right to a remedy for underpayments for outlier services is found in 42 U.S.C. § 1395*oo*(f). Section § 1395*oo* provides for a Provider Reimbursement Review Board and subsection (f) provides for judicial review of the Board's determinations. Providers are entitled to a remedy when payments do not comply with the law. The question in this case is whether the Plaintiffs have shown a violation of § 1395ww(d)(A)(iv).

and the 5% minimum established by the Medicare Act.")) Under the Plaintiffs' theory, one cannot determine whether actual payments made is at least 5% of the total projected payments unless one already knows the amount of payments that were made. This requires reference to historical data and, ultimately, retroactivity.

The issue in this case is like that in both *County of Los Angeles* and *Rush-Presbyterian-St. Luke's* where the courts interpreted the "payments made" language in § 1395ww(d)(5)(A)(iv) and found it ambiguous. In *County of Los Angeles*, the plaintiff hospitals argued that the "payments made" language required the Secretary to recalibrate outlier variables and make retroactive payments where the outlier payments were under the minimum statutory target. The plaintiff hospitals also argued that the phrase "payments made" meant that the total amount of additional payments actually made during a fiscal year had to meet the five percent target. The D. C. Circuit rejected this argument. The court said:

> Standing alone . . . the phrase "payments made" hardly conveys a single meaning, much less the one that the Hospitals advance. As it is employed in paragraph (5)(A)(iv), "payments made" is "simply an adjectival phrase, not a verbial phrase indicating the past tense, and hence allows alternative temporal readings." *United States Dep't of the Treasury v. FLRA*, 960 F.2d 1068, 1072 (D.C. Cir.1992). It is not unlike the phrase "recognized as reasonable," which the Supreme Court . . . held "does not tell us whether Congress means to refer the Secretary to action already taken or to give directions on actions about to be taken." *Regions Hosp. v. Shalala*, 522 U.S. 448, ----, 118 S.Ct. 909, 916, 139 L.Ed.2d 895 (1998) (quoting *Tulane Educ. Fund*, 987 F.2d at 796). Evincing the same syntactical equivalence, the phrase "payments made" in paragraph (5)(A)(iv), though certainly capable of accommodating the Hospitals' interpretation, can just as easily be read to reflect Congress's intent to "give directions on actions about to be taken." *Id.* In other words, instead of embodying a retrospective inquiry into the amount of outlier payments that have been made, the phrase "payments made under this

> subparagraph" might just as plausibly reflect a prospective command to the Secretary about how to structure outlier thresholds for payments to be made in advance of each fiscal year.

*County of Los Angeles*, 192 F.3d at 1013-14.  *See also Rush-Presbyterian-St. Luke's Med. Ctr.*, 2003 WL 22019351, at *5-6 (following the reasoning of *County of Los Angeles*).

The D.C. Circuit's reasoning is persuasive.  The phrase "payments made" in this context is ambiguous as it is susceptible to more than one meaning as to time.  The phrase is susceptible to the Plaintiff hospitals' interpretation—meaning payments that actually have been made.  But the term "payments made" reasonably can be interpreted as instructing the Secretary on how to structure outlier thresholds for payments to be made in each fiscal year.  *See County of Los Angeles*, 192 F.3d at 1013.  This latter interpretation makes more sense when viewed in the context of the entire sentence in paragraph (5)(A)(iv).  The statute provides that "[t]he total amount of the additional payments made" is to be a percentage "of the total payments projected or estimated to be made. . . ."  42 U.S.C. § 1395ww(d)(5)(A)(iv).  It would make little sense if the first amount mentioned must be actual payments made whereas the second payment amount is based on projection or estimation only.  Having found ambiguity in the § 1395ww(d)(5)(A)(iv), the court now turns to the surrounding context in search of the proper meaning.

    B.    *Statutory Context*

The Plaintiffs argue that consideration of the surrounding statutory provisions of the Medicare statute support their position. They first rely on § 1395ww(d)(5)(A)(i) which states that "the Secretary shall provide for an additional payment for" outlier discharges and § 1395ww(d)(5)(A)(v) which states that the Secretary "shall provide" for various day outlier percentages for various fiscal years. This "shall provide" language, however, also is lacking as to a temporal aspect and is thus ambiguous. The Secretary does not dispute that he is to provide for outlier payments.

The Plaintiffs argue that Congress intended for outlier payments to be budget or revenue neutral, *see* 42 U.S.C. § 1395ww(d)(3)(B), and the Secretary's reading of the statute is inconsonant with budget neutrality. The Plaintiffs argue that for the years at issue, the Secretary decreased the total amount for DRG payments by the estimated amount for outlier payments and then "made outlier payments substantially less than what was taken from DRG payments" (Br. Supp. Pls.' Mot. Summ. J. Br. 16), resulting in a windfall to the Medicare program. The Secretary agrees that outlier payments are to be roughly revenue neutral, but disputes that the Plaintiffs' interpretation achieves this goal.

Consideration can begin with § 1395ww(d)(3)(B) which provides:

> The Secretary shall reduce each of the average standardized amounts determined under subparagraph (A) by a factor equal to the proportion of payments under this subsection (as estimated by the Secretary) based on DRG prospective payment amounts which are additional payments described in paragraph (5)(A) (relating to outlier payments).

11

This subparagraph refers to outlier payments as payments "as *estimated* by the Secretary." Use of this language supports the Secretary's interpretation of § 1395ww(d)(5)(iv) as requiring him to set outlier thresholds at levels that he estimates will result in outlier payments between five and six percent of total DRG payments. As the D.C. Circuit explained the significance of (d)(3)(B) on the interpretation of (5)(A):

> Given that in paragraph (3)(B) it had already indicated that the Secretary would estimate the amount of outlier payments described in subparagraph 5(A), Congress could have reasonably concluded that there was no need to provide expressly in paragraph 5(A)(iv) that the phrase "payments made" referred to payments estimated to be made.

*County of Los Angeles*, 192 F.3d at 1015. The D.C. Circuit concluded that the statutory context did not elucidate the meaning of the ambiguous phrase "payments made." *Id.* This reasoning is also persuasive. Congress's statement in (d)(3)(B) that the outlier payments in (d)(5)(A) are to be estimated by the Secretary suggests that the Secretary's reading is correct. Further, § 1395ww(d)(5)(A)(i) requires the Secretary to provide for outlier payments based on "fixed number" thresholds—not variable thresholds that are retroactively modified to reach a set result. 42 U.S.C. § 1395ww(d)(5)(A)(i); *see also County of Los Angeles*, 192 F.3d at 1019 ("It strains credulity to assume that Congress would have directed the Secretary to establish outlier thresholds in advance of each fiscal year . . . and process millions of bills based on those figures, only to have [him] at the end of the year recalibrate those calculations . . . and disburse a second round of payments."). This, too, supports the Secretary's reading.

12

The Plaintiffs look to provisions regarding payments for indirect medical education ("IME") and disproportionate share hospitals ("DSH") for support.  *See* 42 U.S.C. § 1395ww(d)(5)(B) (IME),  § 1395ww(d)(5)(F) (DSH).  The tying of these payments to the outlier payments does not necessarily reveal Congress's intent that actual outlier payments made be between five and six percent of the total DRG projected payments.  It is not clear that the mere tying of these other payments to outlier payments requires greater flex in outlier payments.  Plaintiffs next argue that nothing in the IME and DSH payment provisions requires retroactive adjustment of IME and DSH payments, but courts have required reimbursement when such payments were not properly made.  The cases cited by the Plaintiffs, *see, e.g.*, *Legacy Emmanuel Hospital & Health Center v. Shalala*, 97 F.3d 1261 (9th Cir. 1996); *Jewish Hospital, Inc. v. Secretary of Health & Human Services*, 19 F.3d 270 (6th Cir. 1994), involved statutory language quite different than that at issue here[3] and concerned whether particular days were included in the calculation of the DSH payment.  The courts in those cases found the IME and DSH payment provisions unambiguous.  It would be a stretch to say that the lack of ambiguity in those other provisions supports the conclusion that the outlier payment provision is likewise unambiguous.  Anyway the courts decided that retroactive reimbursement was appropriate in the cited cases only after finding that the Secretary's interpretation of a statutory provision was erroneous.

---

[3]  The language was "patients who (for such days) were entitled to benefits under part A of this subchapter," and "patients who (for such days) were eligible for medical assistance under a State plan," § 1395ww(d)(5)(F)(vi)(I) and (II).

The Plaintiffs also seek support in *Georgetown University v. Bowen*, 862 F.2d 323 (D.C. Cir. 1988). But that case is inapposite. The D.C. Circuit distinguished this decision in *County of Los Angeles.* 192 F.3d at 1019.[4] As the *County of Los Angeles* court noted, *Georgetown* "concerned retroactive adjustments under the pre-PPS 'reasonable cost' system—clearly a payment methodology lacking any relationship to PPS. . . ." *Id.* at 1020 n. 3. Thus, the reasoning of *Georgetown* does not reach the instant case. *Georgetown* itself expressly recognized the difference between the cost-based system and the PPS:

> [W]hen the PPS statute instructs the Secretary to determine "allowable operating costs per discharge" under the *new* prospective payment methodology, *see* 42 U.S.C. § 1395ww(d)(2)(A), it invokes an entirely different sense of the term: costs that are allowable under the new system may *not* be subject to subsequent retrospective revision, but that certainly does not mean that the same must be true when the statute refers to costs that were "allowable" under an entirely different payment methodology.

*Georgetown*, 862 F.2d at 327 n. 11. This case involves the "new" PPS methodology.

### C.  *Legislative History*

The court next considers whether the legislative history sheds any light on the correct interpretation of § 1395ww(d)(5)(A)(iv). The Plaintiffs point to the House Report which stated "the Secretary would be *required* to provide additional payments, amounting to not less than 4 percent of total DRG related payments, as outlier payments." H. Rep. No. 98-25, at 135 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 219

---

[4] *Georgetown University* and *County of Los Angeles* were authored by the same judge.

(emphasis added by Plaintiffs). The trouble with this report is that this language is just as ambiguous as the statutory language at issue. The D.C. Circuit found similar language in the Conference Report ambiguous. *County of Los Angeles*, 192 F.3d at 1015 ("the Secretary would be *required* to provide additional payments for outlier cases amounting to not less than 5 percent, and not more than 6 percent, of total projected or estimated DRG related payments") (emphasis in *County of Los Angeles*).[5]

The Plaintiffs also note that the House version rejected the Secretary's proposal to remove PPS payments from administrative and judicial review, providing for the narrower exceptions for judicial review in the PPS system. H. Rep. No. 98-25, at 142-43 (1983). While accurate, this does not address the statutory language at issue here. The Plaintiffs then direct the court to the Senate Report which raised the outlier payments to not less than five percent nor more than six percent of total payments, reduced the standard DRG payments to fund outliers, and provided for administrative and judicial review of PPS payments. S. Rep. No. 98-23, at 51 (1983), as *reprinted in* 1983 U.S.C.C.A.N. 143, 191. And again, none of this addresses the correct interpretation of the outlier provision in question. In contrast, however, the Senate Report seems to support the Secretary's position in this case: "Total *expected* payments resulting from this policy will be not less than 5 percent, nor more than 6 percent, of total medicare payments to hospitals for inpatient care. . . ." *Id.* (emphasis added). The Plaintiffs highlight that Congress limited the Secretary's discretion. That is

---

[5] The Plaintiffs also rely on this language from the Conference Report. *See* H.R. Conf. Rep. No. 98-47, at 189 (1983), *reprinted in* 1983 U.S.C.C.A.N. 404, 479. Since it is ambiguous, it provides little assistance to the court's understanding of the statutory language.

15

true. However, the question is not whether the Secretary's discretion was limited; the question concerns how that discretion was limited. The court concludes that the legislative history itself is ambiguous and thus adds little to the court's efforts in ascertaining the meaning of § 1395ww(d)(5)(A)(iv).

### D. Statutory Scheme

So, the court considers whether the Secretary's interpretation is "reasonable and consistent with the statutory scheme. . . ." *County of Los Angeles*, 192 F.3d at 1015. In doing so, the court should "accord particular deference to the Secretary's interpretation . . . given the tremendous complexity of the Medicare statute." *Id.* at 1016 (quotation omitted). Significantly, the Secretary's interpretation of paragraph (5)(A)(iv) has remained consistent for the more than twenty years since the PPS began: "[T]here is no necessary connection between the amount of estimated outlier payments and the actual payments made to hospitals for cases that actually meet the outlier criteria." 49 Fed. Reg. 234, 265 (Jan. 3, 1984). The Secretary had advised: "if we overestimate the amount of outlier payments, we will not adjust the DRG rates to compensate hospitals for funds that were not actually paid for outlier cases." *Id.* at 265-66. *See also* 57 Fed. Reg. 39746, 39783 (Sept. 1, 1992) (stating "we do not believe that it is appropriate to make an adjustment in prospective payment system payments to account for the difference between the estimated and actual FY 1991 outlier payments, just as we have not made adjustments in earlier years") (citations omitted). Despite the Secretary's consistent interpretation for over twenty years, Congress has amended § 1395ww(d)(5), even making amendments during the years at issue here, without ever changing

(d)(5)(A)(iv).  This reflects a congressional view that the Secretary's interpretation is at least statutorily permissible, if not intended.  See *Rush-Presbyterian-St. Luke's Med Ctr.*, 2003 WL 22019351, at *8.

Furthermore, the Secretary's interpretation "avoids the substantial administrative burden attendant with the Hospitals' vision of paragraph (5)(A)(iv)." *County of Los Angeles*, 192 F.3d at 1019.  The D.C. Circuit observed: "It strains credulity to assume that Congress would have directed the Secretary to establish outlier thresholds in advance of each fiscal year, *see* § 1395ww(d)(3)(B), (d)(6), and process millions of bills based on those figures, only to have h[im] at the end of the year recalibrate those calculations, reevaluate anew each of the millions of inpatient discharges under the revised figures, and disburse a second round of payments."  *Id.*

The Secretary's interpretation is more consistent with Congress's intention in devising a prospective system—PPS.  As the D.C. Circuit said:

> One of the touchstones of the Prospective Payment System, as its name suggests, is prospectively determined reimbursement rates that remain constant during the fiscal year. In setting, prior to each fiscal year, fixed outlier thresholds and per-diem reimbursement rates that are not later subject to retroactive correction, the Secretary promotes certainty and predictability of payment for not only hospitals but the federal government-concerns that played a prominent role in Congress's decision to adopt PPS.

*County of Los Angeles*, 192 F.3d at 1019 (citing H.R. Rep. No. 98-25, at 132 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 351).  Prospective rate setting motivates hospitals to keep costs down.  While not all other elements of PPS are set prospectively, *see* 68

17

Fed. Reg. 34493, 34500 (IME and DSH payments may be retroactively adjusted when hospitals' costs reports are settled to reflect updated data), the Secretary's prospective policy on outlier payments furthers the overall goals of PPS. Thus, "[t]o the extent that the Secretary's prospectivity policy permits hospitals to rely with certainty on one additional element in the PPS. . .the Secretary could reasonably conclude that it will promote efficient and realistic cost-saving targets." *Id.* at 1020. The court therefore finds that the Secretary's interpretation of § 1395ww(d)(5)(A)(iv)—that the calculation of the total outlier payment percentage is made prospectively—is consistent with the overall design of the PPS and is a reasonable interpretation.

The Plaintiff hospitals engage in a lengthy discussion of the available administrative and judicial review procedures in an effort to convince the court that Congress intended that outlier payments be adjusted retroactively. With a few irrelevant exceptions, Congress provided for the same procedures for administrative and judicial review that were available under the cost-based payment program. *See Methodist Hosp. v. Shalala* 38 F.3d 1225, 1230 (D.C. Cir. 1994) (holding that the Secretary could adopt policy that errors in wage indexes would not be corrected retroactively); H. Rep. No. 98-25, at 143 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 219, 362. Yet, the existence of these same procedures does not necessarily reflect an intent to provide the same remedies that were available under the former cost-based system. *See Methodist Hosp.*, 38 F.3d at 1230. In *Methodist Hospital*, the plaintiff hospitals argued that the Medicare statute's administrative and judicial review procedures indicated Congress's intent that the wage index corrections apply retroactively. They contended that

18

Congress retained the procedures so administrative and judicial decisions under the PPS would have the same retroactive effect as they had under the "reasonable cost" system. The hospitals also argued that the right to appeal necessitated the right to retroactive corrections. *Methodist Hosp.*, 38 F.3d at 1230. The court rejected these arguments, concluding that the "decision to retain certain appellate review procedures . . . does not necessarily imply congressional intent to maintain identical *remedies*." *Id.* (emphasis in original). The court specifically said that "the availability of appeal does not necessarily imply the availability of retroactive remedies." *Id.* This court concludes that the availability of administrative and judicial review does not reflect Congressional intent to retroactively adjust outlier payments.

### III.     Conclusion

The phrase "payments made" as used in 42 U.S.C. § 1395ww(d)(5)(A)(iv) is ambiguous. The Secretary's interpretation of (5)(A)(iv)—that he is required to set the cutoff point thresholds at levels he estimates will result in outlier payments being between five and six per cent of total DRG projected payments—is reasonable and thus entitled to deference. Plaintiffs do not contend that the Secretary acted unreasonably in setting the outlier payment rates. Therefore, their Motion for Summary Judgment (Document No. 23) is **DENIED** and Defendant's Motion for Summary Judgment (Document No. 26) is **GRANTED** and Defendants will be granted judgment as a matter of law on each of the Plaintiffs' claims. Judgment will be issued accordingly.

ALL OF WHICH IS ENTERED this 15th day of September 2006.

John Daniel Tinder, Judge
United States District Court

Copies to:

Keith D. Barber
Hall Render Killian Heath & Lyman
kbarber@hallrender.com

L. Richard Gohman
Hall Render Killian Heath & Lyman
rgohman@hallrender.com

David Benjamin Honig
Hall Render Killian Heath & Lyman
dhonig@hallrender.com

N. Kent Smith
Hall Render Killian Heath & Lyman
ksmith@hallrender.com

Brian G. Kennedy
U.S. Department of Justice
brian.kennedy@usdoj.gov

Erin Reilly Lewis
United States Attorney's Office
erin.lewis@usdoj.gov